**ALTECH CONTROLS CORP. and Richard H. Alsenz, Plaintiffs,**

v.

**E.I.L. INSTRUMENTS, INC., Defendant.**

**Civil Action No. H–92–3189.**

United States District Court,
S.D. Texas,
Houston Division.

Sept. 3, 1998.

---

10. Interoffice Memorandum, Office of the Assistant Secretary for Land & Minerals Management,

Relators' Exhibit 1.

Gale R. Peterson, Cox & Smith, Inc., San Antonio, TX, mediator pro se.

David S. Wise, Sulzermedica USA Inc., Legal Counsel, Angleton, TX, Ned L. Conley, Conley Rose & Tayon, Houston, TX, Randy J. McClanahan, McClanahan & Associates, Houston, TX, for Altech Controls Corporation, Richard H Alsenz.

Albert Berton Deaver, Jr., Arnold White & Durkee, Houston, TX, Michael O. Sutton, Sidley & Austin, Dallas, TX, John R. Schiffhaur, Fish & Richardson, Menlo Park, CA, for EIL Instruments Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING LACHES AND EQUITABLE ESTOPPEL

HARMON, District Judge.

Pending before the Court in the above referenced patent infringement action are the following motions, pursuant to Fed. R.Civ.P. 50:(1) Plaintiffs Altech Controls Corporation and Richard H. Alsenz's motion for judgment as a matter of law that Defendant E.I.L. Instruments, Inc. ("EIL") is not entitled to a defense of laches with respect to the '776, '700, and '326 patents (instrument # 410) and (2) Plaintiffs' motion for judgment as a matter of law that EIL is not entitled to a defense of equitable estoppel with respect

to the '776 and '700 patents (instrument # 411).

Plaintiffs and EIL have both submitted post-trial amended proposed findings of fact and conclusions of law on laches and equitable estoppel (Plaintiffs' in # 418, EIL's in # 422), and EIL has submitted two supplemental briefs on recent cases from the Federal Circuit (# 439 and 440), to which Plaintiffs have responded.

After the Court entered findings of fact and conclusions of law and granted summary judgment in favor of Defendant E.I.L. Instruments, Inc. ("EIL") on the issues of literal infringement (# 324, entered on June 5, 1997) and subsequently on prosecution estoppel barring Plaintiffs' claims of infringement of asserted claims of the '776 patent by EIL's RC–1000 and RC–2000 under the doctrine of equivalency (# 354, entered on December 3, 1997), the remaining portion of this case dealing with infringement under the doctrine of equivalents, validity of the '700 and '776 patents, and literal infringement of the '700 patent by the RC–48 was tried before a jury on December 9–22, 1997.[1] The resulting jury verdict found in favor of Plaintiffs on all issues (# 408, entered on December 22, 1997).

After reviewing the record, the evidence submitted at trial, and the applicable law, the Court issues the following findings of fact and conclusions of law regarding laches and equitable estoppel, both doctrines with respect to the '776 and '700 patents, and the former alone with respect also to the '326 patent, as indicated below.

### FINDINGS OF FACT

United States Patent No. 4,612,776 ("the '776 patent") issued on September 23, 1986, United States Patent No. 4,628,700 ("the '700 patent") issued on December 16, 1986, and United States Patent No. 5,067,326 ("the '326 patent") issued on November 26, 1991.

This suit was filed on October 15, 1992, over six years after the issuance of the '776 patent and five years and ten months after the issuance of the '700 patent.

The '326 patent, which issued on November 26, 1991, was only added to this suit after the Court granted Plaintiffs' motion to do so on February 22, 1994.

As an alleged willful infringer, EIL's conduct is subject to scrutiny. The Court finds that EIL has acted equitably throughout this litigation, and that its factual and legal positions have been well founded. Moreover, the Court finds that there is no evidence of willful infringement, which would preclude defenses of laches and equitable estoppel. The evidence does shows the EIL was making and selling the RC–48 controller before the '776 and '700 patents issued and included the accused feature of the '326 patent in its products before the '326 patent issued. Although Sam Woodside, President and CEO of EIL, testified that he became aware of the '776 and '700 patents in 1988 when he learned of the CPC litigation, he also testified that the RC–48 controller was about to be phased out and that an internal evaluation led to the conclusion that the RC–1000 product would not infringe the two patents. In addition, when the '326 patent was added to this action, the validity and infringement issues were evaluated and the disputed feature was removed from EIL's controllers. Moreover, in finding no unclean hands on EIL's part, the Court notes that EIL has even stipulated to infringement where it concluded such conduct was appropriate, i.e., in stipulating that modes 5–7 of its RC–48 controller infringed claim 24 of the '776 patent and, following an investigation initiated in 1994 of validity and infringement of the '326 patents, in eliminating the motor speed-up feature, which it stipulates would have infringed the asserted claims of the '326 patent if that feature was actually used by a customer in a refrigeration system, from the RC–2000 controller on May 16, 1995 and from the ERC–1000 controller on May 17, 1995.

Based on all the circumstances supported by evidence, the Court finds that Plaintiffs had actual knowledge of EIL's potentially infringing activities with regard to the '776 patent and yet unreasonably and inexcusably delayed in bringing suit. During the prose-

---

1. EIL stipulated that modes 5–7 of the RC–48 infringed claim 24 of the '776 patent.

cution of the '776 patent, Richard Alsenz filed with the United States Patent and Trademark Office a Declaration, dated May 4, 1985, that identified EIL as one of several companies that he believed were infringing the claims of the application. Joint Exhibit ("JX") 776, Tab 49, at p. 261. Thus Alsenz was aware of EIL's allegedly infringing activity as of September 3, 1986, the date when the '776 patent issued.[2] Moreover, according to Alsenz's deposition testimony on October 25, 1994, TR at p. 247, par. 25, he examined EIL's RC-48, accused of infringing the '776 and '700 patents, at Hill Refrigeration in the *early 1980's* and concluded that it came within the scope of the claims then pending in the '776 application.

Moreover, at the beginning of July 1987, after both the '776 and '700 patents had issued, Richard Alsenz and Sam Woodside met. Although their testimony conflicts about what was discussed, the Court finds Woodside's testimony far more credible for several reasons. First, Mr. Alsenz's testimony before this Court during significant hearings in this case, especially the *Markman* hearing where he was required to testify at length, has been anything but convincing; indeed the Court finds that he was consistently defensive, devious, nervous, insincere, and unwilling to provide any information, indeed even aimed to conceal or muddle relevant matters. He persistently circumvented questions and refused to answer even simple yes-or-no questions directly.[3] Second, Woodside's version of the meeting is in part confirmed by his subsequent, unanswered business letter to Alsenz, dated July 1, 1987 (PX-73). Third, in contrast to Alsenz's obfusca-

tions, Woodside's testimony at trial was straightforward, credible, and consistent. Woodside testified that their meeting concerned a possible joinder or merging of the product lines of EIL and Altech. Moreover, at the meeting Alsenz complained that competitor CPC had copied Altech's products, but stated that he had no problem with EIL because EIL had developed its own products. Woodside further stated that he came away from the meeting with the belief that Altech would not assert its patents against EIL because the two companies' products occupied different market segments (EIL's product was in the mid-range market segment, while Altech's was in the lower end, according to Woodside's testimony), as is reflected in his follow-up July 1, 1987 letter to Alsenz, PX-73 ("In addition, based on our different product concepts, we would dominate both the middle and low end of the market, and could offer customers a wide range of products to meet their specific needs."). In contrast, nothing in the letter reflects anything that Alsenz claims occurred at the meeting. It makes no mention of patents or proposed licenses, it does not support Alsenz's claim that Alsenz gave Woodside copies of the '776 and '700 patents at the meeting, nor does it mention any potential litigation between the two parties. Moreover, it is logical to expect that if Alsenz disagreed with statements in Woodside's letter, he would have challenged them, yet Alsenz did not respond to its contents.[4]

▮ Under the facts here, in view of the prior relationship between the parties and the limited size of the industry, and evidence

2. The Declaration states in relevant part,
 In addition to the three companies for which Altech has documents showing actual copying of the present invention, Altech is aware from reports from its customers and its salesmen that other companies have adopted the same strategy in their multiple control systems as is claimed in the present application.
 EIL is then identified as one of these companies.

3. In its proposed findings of fact and conclusions of law EIL quotes extensively from and generously characterizes Alsenz's uninformative testimony as an instance of faded memory caused by passage of time and evidencing prejudice to EIL. The Court's reaction is substantially more skeptical and censorious.

4. Without any corroborative evidence, Alsenz testified that he told Woodside that he would enforce his patents against the industry, that he talked about licensing with Woodside, and that Woodside responded that Woodside would not take a license until Alsenz had Woodside on the courthouse steps. Woodside denies all these statements.

 Moreover, while Plaintiffs have claimed recently that Alsenz informed Woodside at that meeting or subsequently that EIL's products came within the scope of the '776 patent, neither Alsenz nor Woodside mentioned such in their testimony.

that Plaintiffs were aware of EIL's alleged infringing products, if that awareness was not actual knowledge, but merely constructive knowledge, the Court finds that Plaintiffs had a duty to investigate EIL's activities under the circumstances, a duty that they failed to satisfy. Plaintiffs, themselves, have observed that "the industry in which Altech and EIL compete is relatively small." "The patentee who is negligently or willfully oblivious to [sales, marketing, publication, public use, or other conspicuous activities of potential infringement] cannot later claim his lack of knowledge as justification for escaping the application of laches...." [5]

Woodside substantially relied to his personal detriment and EIL's prejudice on his reasonable inferences after his meeting with Alsenz that Alsenz would not enforce its patents against EIL. At the time of the meeting EIL was a public company. During May–November 1989, a management team, including Woodside, transformed the company into a private entity, took on substantial debt, and provided personal guarantees in a total amount of approximately 21.6 million dollars. Woodside credibly testified, and it is logical to conclude, that he would never have taken on such personal debt had he thought that Altech would sue EIL for patent infringement. Furthermore, in 1992 EIL refinanced its balance sheet and absorbed its Energy Controls operation, previously a wholly-owned subsidiary known as Conservation and Controls, Inc., which had manufactured and sold the accused controllers. The new structure thus exposed EIL to wider liability. Woodside also testified that EIL would clearly not have collapsed the subsidiary into its organization had it believed there was a reasonable likelihood that Altech would sue. This new arrangement, in contrast to the separate subsidiary structure, further forced EIL to sell assets, as opposed to stock, when it sold its Sales and Service Division, in addition to exposing it to an approximately 4.1 million dollar federal tax liability. *See* corporate records contained in DX–124. The refinancing and restructuring clearly constitute evidence of prejudice to EIL on both

laches and equitable estoppel defenses and corroborate Woodside's testimony.

As further reason for Woodside's reasonable inference that Alsenz and Altech would not sue EIL for infringement, Altech's suit against the Larkin Group and CPC, which involved the same '776 and '700 patents at issue here, was concluded by entry of judgment and settlement in September 1990. Woodside testified that he learned through talk in the industry that the settlement was for a small amount of money, justifying his expectation that there would be no suit against EIL.

During and after the suit against CPC, Plaintiffs never notified EIL of the litigation or of their intent to enforce the patents against EIL after the CPC suit was completed.

Altech's patent suit against PTL, lasting from 1986–1992, did not involve any of the patents at issue here. Woodside testified that he was unaware of that litigation and no documents were admitted to show otherwise. Altech did not notify EIL that it was involved in litigation against PTL or that it would enforce its patents against EIL after that litigation ended.

The Court finds that Altech unreasonably delayed in bringing suit against EIL on the '776 and '700 patents, given Plaintiffs' awareness of EIL's activities, including cognizance of the RC–48 before the '776 and '700 patents even issued.

The Court finds that as a result, *inter alia*, of Altech's failure to notify EIL of the suits against CPC and PTL, EIL was misled into believing that Altech would not enforce its patents against EIL. Therefore, under all of the facts and circumstances here, Altech cannot use the litigation against both CPC and PTL as an excuse for delay in bringing suit against EIL.

The delay in suing EIL resulted in material prejudice, both economic and evidentiary, to EIL. In addition to that discussed *supra*, in reliance on its reasonable belief that Altech would not assert its patents against EIL, EIL invested money in develop-

5. *Wanlass v. General Electric Co.*, 148 F.3d 1334, 1338–39 (Fed.Cir.1998).

ing and marketing the RC–1000 controllers and the ERC–1000 and RC–2000 controllers, which use the same basic logic as the RC–1000. Furthermore, EIL no longer has any invoices of sales of the RC–48 before November 1987. Because the law holds that if an accused infringer no longer retains documents showing which portion of sales were of the infringing product in comparison to non-infringing products, inferences may be drawn against the accused infringer,[6] these missing documents constitute prejudice. The effects of passage of time from the issuance of the '776 and '700 patents until the filing of this suit constitute prejudice. Inevitably memories have faded, as is readily evident in so much of the testimony before the Court in the course of this litigation regarding issues that arose up to twenty years ago, and numerous documents have been lost or destroyed.

## CONCLUSIONS OF LAW

### A. JURISDICTION AND VENUE

The Court has original and exclusive federal question jurisdiction over all claims asserted in this suit pursuant to 28 U.S.C. § 1331 and § 1338(a) because this patent infringement action arises under the patent laws of the United States, 35 U.S.C. §§ 271 *et seq.* Venue is proper under 28 U.S.C. § 1400(b).

### B. LACHES

EIL bears the ultimate burden of proving laches by a preponderance of the evidence as to all three patents. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1038 (Fed.Cir.1992) (*en banc*). To invoke a laches defense, EIL must show (1) that the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the point when he knew or reasonably should have known of its claim against the defendant and (2) his delay materially prejudiced or injured the defendant. *Id.* at 1032; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463–64 (Fed.Cir.1998).

Material prejudice to the adverse party may be either economic (e.g., loss of monetary investments, incurring damages

that might otherwise have been avoided by an earlier suit) or evidentiary, i.e., preventing the defendant from presenting a full and fair defense on the merits (e.g., loss of records, death of a witness, deteriorating memories of past events). *Aukerman*, 960 F.2d at 1033. Defense prejudice can also be demonstrated where the alleged infringer shows it would have acted differently had the patentee sued earlier. *Meyers v. Asics Corp.*, 974 F.2d 1304 (Fed.Cir.1992). The defendant can also show prejudice if it increased capital investment or production because of a reasonable belief that the patent owner would not sue. *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed.Cir.1990).

There is no fixed period of time *per se* classified as "unreasonable" delay; that determination rests on the circumstances of the particular case. *Aukerman*, 960 F.2d at 1032. Nevertheless, where the plaintiff-patentee delays more than six years in initiating an infringement lawsuit from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities, a rebuttable presumption of unreasonable, inexcusable delay and prejudice arises. *Aukerman*, 960 F.2d at 1035; *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1552–53 (Fed.Cir.1996); *Fedders*, 145 F.3d at 1464. The period of delay is calculated from the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities. *Wanlass v. General Electric Co.*, 148 F.3d 1334, 1337–38 (Fed.Cir. 1998). Where the patentee has constructive knowledge of the defendant's alleged infringing activities, he "is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Wanlass*, 148 F.3d 1334, 1337, *quoting Johnston v. Standard Mining Co.*, 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480 (1893). Where there is no actual knowledge and where ignorance is not justifiable, the facts may warrant imposition of a duty to inquire as the circumstances suggest. *Id.* "[S]ales,

---

6. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983).

marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement." *Id., citing Hall,* 93 F.3d at 1553. As the Federal Circuit explained in *Wanlass v. General Electric,* 148 F.3d 1334, 1339-40,

> ... [A] reasonable patentee, motivated by his interest in recovering for and preventing infringement, keeps abreast of the activities of those in his field of endeavor. Allocating the burden to patentees to seek out infringers is proper, furthermore, because compared to potential infringers, they are in the best position to know the scope of their patent protection and, therefore, also to know likely places to find infringement. This superior knowledge generally allows them to incur comparatively lower costs in investigating potentially infringing activities than competitors would incur conducting patent searches on every aspect of their products and notifying the patentee of their results.

Past dealings with the alleged infringer, including the offering of a license on the patent at issue and being told by the alleged infringer that it considered the patent invalid and rejected the offer, further support imposition of a duty to investigate the allegedly infringing activity. *Id.* Therefore, if Plaintiffs had only constructive knowledge of EIL's allegedly infringing activities, the Court concludes under the circumstances in this case that Plaintiffs had a duty to investigate EIL's activities with regard to the '776 patent.

 The period of delay in filing suit does not begin prior to the issuance of the patent. *Aukerman,* 960 F.2d at 1032. Thus, as a matter of law, the presumption does not apply to the '700 and '326 patents because Plaintiffs filed this suit within six-years after these two patents were issued. Nevertheless the Court concludes that EIL has met its burden of proof in establishing a laches defense as to all three patents.

 If the presumption of laches is applied, a *prima facie* defense of laches has been made. *Wanlass,* 145 F.3d at 1464.

The burden of production then shifts from the alleged infringer to the plaintiff-patentee to rebut and eliminate by "a minimum quantum of evidence" the presumption by demonstrating excusable delay that is legally cognizable and/or lack of prejudice or injury. *Aukerman,* 960 F.2d at 1037-38; *Hall,* 93 F.3d at 1553-54. Poverty alone is not a legally cognizable excuse for failure to initiate suit. *Hall,* 93 F.3d at 1554. The excuse of involvement in other litigation is also insufficient unless there is adequate notice to the alleged infringer of the other proceeding and of the patent owner's intention to enforce its patent upon completion of that proceeding. *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1573 (Fed.Cir.1987). There is no rigid requirement that such notice must be given if a defendant is aware of such litigation from other sources. *Aukerman,* 960 F.2d at 1039. Where there has been prior contact between the parties, however, the equities may require appropriate notice. *Id.; Hall,* 93 F.3d at 1554. Under the circumstances here, the Court concludes that adequate notice to EIL was necessary.

 If the patentee fails to rebut the presumption by coming forward with affirmative evidence of a lack of prejudice or a legally cognizable excuse for its delay in initiating litigation, the court must infer unreasonable delay and prejudice. *Hall,* 93 F.3d at 1553-54; *Fedders,* 145 F.3d at 1464. If however, the plaintiff-patentee does present sufficient evidence that, if believed, raises a genuine issue of fact as to either element of the laches defense and would thus challenge a finding in favor of the infringer, the burden of production shifts back to the defendant to satisfy its ultimate burden of persuasion with actual evidence to show unreasonable delay and prejudice. *Aukerman,* 960 F.2d at 1038.

 Even where the defendant shows undue delay and prejudice by a preponderance of the evidence, the application of the equitable defense of laches is not mandatory but is within the sound discretion of the district court, which must examine all the facts and circumstances of a particular case in its determination. *Aukerman,* 960 F.2d at 1036. If the district court rules that laches

applies, the defense bars relief only for infringement prior to suit. *Id.* at 1041.

## C. EQUITABLE ESTOPPEL

 While laches focuses upon the reasonableness of the plaintiff's delay in bringing suit and the seriousness of the prejudice to the defendant, equitable estoppel "focuses on what the defendant has been led to reasonably believe from the plaintiff's conduct." *Aukerman,* 960 F.2d at 1034. Where there has been contact or a relationship between the parties during the period of delay before initiation of suit that may give rise to an inference that the patentee has abandoned its claim against the defendant, as here, the defense of equitable estoppel as well as of laches may apply. *Id.* The application of equitable estoppel, too, is within the sound discretion of the district court. *Id.* at 1041. The effect of applying the defense of equitable estoppel is that all relief on all claims in a suit may be absolutely barred. *Id.*

 To assert an equitable estoppel defense, a defendant must show that (1) the plaintiff/patentee, usually with knowledge of the true facts, through misleading conduct (including specific statements, prior threats to sue, action, inaction or silence where there is an obligation to speak), leads the defendant/alleged infringer to reasonably infer that the plaintiff/patentee does not intend to enforce its patent against that alleged infringer, (2) the defendant/alleged infringer relies upon that conduct or communication, and (3) because of the reliance, the defendant/alleged infringer would be materially harmed if the plaintiff were later permitted to assert the claim. *Scholle Corp. v. Blackhawk Molding Co., Inc.,* 133 F.3d 1469, 1471, 1473 (Fed.Cir.1998); *Aukerman,* 960 F.2d at 1041. "Delay in filing suit may be evidence which influences the assessment of whether the patentee's conduct is misleading but it is not a requirement of equitable estoppel." *Aukerman,* 960 F.2d at 1042.

 The inference drawn by the defendant from the plaintiff's misleading conduct is frequently the belief that the alleged infringer "will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged." *Id.* The plaintiff's conduct must suggest that the plaintiff did not intend to sue the defendant for infringement. *Id.* Thus, unlike with a laches defense, the defendant must be aware of the patentee or of his patent. *Id.* A frequent scenario is where the patentee specifically complains of alleged infringement and then does not follow up on his challenge for years. *Id.* This period of inaction constitutes the patentee's "misleading conduct." *Id.* Silence alone is insufficient to give rise to estoppel. *Hottel,* 833 F.2d at 1573. There must be at least some proof that the silence was misleading enough to constitute bad faith. *Id.* at 1574. There must be evidence of misconduct or misleading silence sufficient to support a reasonable inference that the plaintiff has abandoned his patent claims. *Id.* Inaction combined with other facts of the relationship or contacts between the parties may also give rise to the inference that the patentee has abandoned its claim against the defendant. *ABB Robotics Inc. v. GMFanuc Robotics Corp.,* 52 F.3d 1062, 1064 (Fed.Cir.), *cert. denied,* 516 U.S. 917, 116 S.Ct. 306, 133 L.Ed.2d 211 (1995). In *Scholle,* 133 F.3d at 1472, noting that while patentees do not "have a general duty to either grant patent infringement clearance or else sue any rival who so asks," the Federal Circuit remarked,

> [W]hen the course of dealings between a patentee and an alleged infringer is such that the alleged infringer reasonably infers from the patentee's misleading conduct or inaction that the patentee has waived its patent rights, then the first element of equitable estoppel has been established absent a statement to the contrary by the patentee.

*Id.* ("when told by [the alleged infringer] that [it] would market [the alleged infringing product] unless [the patentee] informed [the alleged infringer] that it considered the [alleged infringing product] to infringe its '354 patent, patentee remained silent."). "Other litigation is a fact that can impact the defense of equitable estoppel provided that the alleged infringer is aware of such other litigation". *Scholle,* 133 F.3d at 1473.

 The second element, the alleged infringer's substantial reliance on the paten-

tee's misleading conduct, including inaction, requires a showing that the infringer had a relationship or a communication with the plaintiff that lulled the defendant into a sense of security in going on with the defendant's activities. *Id.* at 1043.

The last element, material prejudice to the defendant if the plaintiff is allowed to proceed with his claims, can be shown, as with laches, by an altered economic status or by loss of evidence. *Aukerman,* 960 F.2d at 1043.

There is no presumption of laches or set time period applied to the defense of equitable estoppel, which could therefore arise much sooner than six years. *Scholle,* 133 F.3d at 1473. While the defense of laches requires unreasonable, inexcusable delay and prejudice to the infringer, estoppel adds as an element affirmative conduct by the holder of the patent that induces the alleged infringer into believing that the patentee has abandoned its claim. *E.T. Mfg. Co. v. Xomed, Inc.,* 679 F.Supp. 1082, 1084 (M.D.Fla.1987). There is no need to prove intent to mislead; the issue is whether the patentee's course of conduct reasonably gives rise to the inference that the alleged infringer is not going to enforce its patent rights against the alleged infringer. *Adelberg,* 921 F.2d at 1273.

### SUMMARY APPLICATION OF LAW TO FACTS

The Court concludes that in light of the more than six-year delay in filing suit against EIL, the presumption of inexcusable delay and of prejudice, i.e., of laches, arises as to the '776 patent.

Plaintiffs fail to meet their burden of production to rebut the presumption of laches as to the '776 patent. First Altech fails to show that its delay was reasonable. Altech's excuse of insufficient funds, alone, does not excuse its delay in filing suit. Nor does Altech's failure to provide adequate notice to EIL of its two other patent litigations against Computer Process Control, Inc. ("CPC") from January 1986 through October 1990 or against PTL from January 1986 through March 1993. Nor does Altech's fail-

ure to communicate its intention to sue EIL support an inference of excusable delay. Sam Woodside credibly testified the he learned of the litigation against PTL only in the course of the instant suit. Plaintiffs also present no evidence of lack of prejudice, either economic or evidentiary, to EIL. Thus the unrebutted presumption of unreasonable delay and prejudice raised by EIL, along with all the circumstances here, supports application of the laches defense in regard to the '776 patent.

The Court further concludes that EIL has met its ultimate burden of proof in establishing a defense of laches as to the '776, '700, and '326 patents.

The Court also concludes that the defense of equitable estoppel has been established as to the '776 and '700 patents.

Finally, in its discretion the Court further additionally finds that under the facts and equities of this case, these defenses should appropriately be applied as indicated on EIL'S behalf to Plaintiffs' patent infringement claims in this action and bar recovery for any infringement. EIL is not liable for any damages that it might otherwise have had with respect to the '326 patent before the Court granted leave on February 22, 1994 to add the '326 patent to this case.

To the extent that any finding of fact should properly be designated a conclusion of law and vice versa, that mischaracterization shall not affect the determination of the Court.

In light of the above, the Court

ORDERS that Plaintiffs' motions for judgment as a matter of law on laches and equitable estoppel are DENIED.

Finally, the Court

ORDERS that both sides shall inform the Court within twenty days whether any additional issues remain to be decided, and if so, submit appropriate motions. If not, the Court

ORDERS that both sides shall submit within that twenty days a proposed final judgment incorporating all relevant disposi-

tive rulings on liability made in the course of this litigation.